The next argument is in Case No. 21-2225, Pride Technologies v. Khublall Thank you, Your Honor, and may it please the Court, Neal Klausner, Davis & Gilbert, LLC, on behalf of Appellant Pride Technologies, Inc., doing business as Pride One. We are here appealing the District Court's grant of summary judgment against my client on its claim of tortuous interference with business relations against the aptly Daniel Khublall. We believe the record demonstrates significant issues of fact which would require a trial of this cause of action, issues pertaining to Mr. Khublall's motive, intent, motivations, and the extent to which he caused Thompson Reuters, his employer, to terminate its relationship with Pride. On this appeal, this Court has the right for de novo review of our motion for summary judgment. Pride is a human capitals firm. Among its services are payroll services, and that is onboarding temporary staff, employing them, paying them, administering their benefits, and other human resource capabilities. It had this job for the temporary staffing at Thompson Reuters. No criticism. There had been discussions about expanding that relationship globally and to extend it, the types of services that Pride would provide. So, but Thompson had begun this direct sourcing program. They hired a consultant to advise them, and then they were getting rid of Pontoon, I guess, the company. And so, I think this goes to causation. It seemed like this relationship was going to be ending anyways, and I'm wondering what you have to say to that. Well, thank you, Your Honor. No, the direct source capabilities of this entity, TalentNet, was irrelevant to the services that Pride was providing to Thompson Reuters. It affected how the temporary staff was identified, whether it was through recruiters, staffing agencies, or directly through some artificial intelligence technology that TalentNet said it was developing. That would have no bearing on Pride continuing to provide payroll services to the staff that TalentNet or Pontoon hired. But wait a minute. Kubal is not somebody who's just outside the company interfering in the relationship, right? He's part of Thompson. And wasn't it his job to come up with a direct sourcing model and to determine how Thompson was going to do contingent labor? And wouldn't it be, therefore, within the scope of his employment to decide that I want to move to a different vendor or arrange things in a different way? Maybe it was a bad decision, but the question is, isn't it in the scope of his employment? What was in the scope of his employment, sure, was deciding how to select the staff for Thompson Reuters. Right, so if you decide that actually we're going to use a different vendor, even though the other one, there are no issues with it, but I think this other vendor has a more effective model, or I've devised a more effective model involving different vendors, that would be within the scope of his employment. You have to show some reason to think that he's acting ultra-virous, don't you? Yes. So that's not what happened here. What happened here was, as set forth in our papers, there was a malicious motive by Mr. Cabral to get rid of Pride as a vendor for Thompson Reuters. Mr. Cabral thought his job was in jeopardy because his two prior supervisors had been fired, and he thought he was next in line, and devised a scheme and came to Pride. And wanted a job from them. Wanted a job from Pride and said, you need to start referring business to TalentNet, you need to start remitting some of the payments from Thompson Reuters to TalentNet, and otherwise he threatened to terminate the relationship with Pride. Why does that make sense that he wanted a job from Pride, and so therefore he threatened Pride to support TalentNet? His plan was to leave Thompson Reuters, or he was going to be let go by Thompson Reuters, as he ultimately was, and to join Pride with TalentNet already on board. We believe the evidence suggests he was a stakeholder in TalentNet. He was promoting TalentNet to many other parties without Thompson Reuters' knowledge, and was pressuring us to do the same. But then Thompson Reuters looked into this and determined that this was a business decision, right? Thompson Reuters is not upset that he did something that is in the interests of his own personal interest as opposed to the company's, right? There are factual issues about that. What happened was Mr. Kublau presented to Thompson Reuters that he had conducted a request for a proposal, an RFP, to determine who the vendor should be, but he misled his employer about what had happened. This was a sham RFP. He met privately with TalentNet before the RFP was even rolled out. But did Pride explain that to Thompson, and Thompson did an investigation, and still is not unhappy with the result, right? Again, factual issues, because Mr. Kublau presented misinformation to his employer in connection with that investigation, and they did not interview anybody from TalentNet. They didn't interview anybody from Pontoon. They just accepted Mr. Kublau's words, which were not accurate. What's the misinformation? The idea that Pride was not a global company? Pride was not a global company. Pride did not embrace this direct source technology. Those were false. Those are demonstrably false. Are they demonstrably false? I mean, isn't that an opinion that somebody in the human resources industry might have? I mean, I understand that you like the business of your client, but might somebody not have different opinions about different sourcing models? No. Whether Pride is capable of global servicing is a demonstrably provable fact. Its parent is Pride Global. We have offices all over the world. Mr. Kublau knew that. We also presented a response to that RFP which emphasized that we did embrace the direct source technology and would collaborate with TalentNet in rolling that out. So his suggestion to his supervisors that we refuse to embrace that technology was demonstrably false. It was right there in the RFP. So Mr. Kublau himself didn't have the authority to terminate Pride. Is that right? Well, he said he did have the authority, and he wrote to Pontoon. So are you disputing that? Are you saying that he did have the authority in fact? We say he did have the authority, and that is a hotly disputed fact as well. Mr. Kublau says he did not. But at his deposition, we repeatedly asked him, if not you, who at Thomson Reuters decided to fire Pride? He refused to answer that question. Who at Thomson Reuters was critical of Pride other than you? He refused to answer. There were three or four people in the chain of command above him who had to sign off on the termination of vendor contracts. He said he had a supervisor in Europe who was not involved in this process to whom he was feeding this misinformation who would have to sign off. So you're saying different things now. I think your first answer was he did in fact have the authority. It's disputed, but you think he did. And now it seems like you're saying, well, no, he misled his supervisors who did have the authority. You kind of have to pick a theory, don't you? Yes. He told us he had the authority. We have located in discovery his communication to his supervisor in Europe saying that he had decided to move this business after the RFP, just a week after, to Talonhead. And so we think the evidence shows, or at least there is an issue of fact, that it was his decision. He did report it to his supervisor. And what he told the supervisor is he based his decision on the fact that we didn't have global capabilities, we didn't embrace this change, and we did. We did have global capabilities, we did embrace the change, and he didn't tell his supervisors about all of the work he had been doing surreptitiously for Talonhead and his desire to get Talonhead on board. He didn't tell his supervisors that Talonhead had, in fact, helped him devise the RFP. He met privately with Talonhead and the other vendor, Randstad, in advance of the RFP to ensure that they would be the winners. So isn't that your real argument? So it's got to be the case that whenever somebody decides to make a decision to drop one vendor and adopt another, they're going to say something critical about the one vendor. I don't know if that shows that he's acting outside the scope of his employment. But if he's in cahoots with Talonhead to give them some special benefit that's not deserved and worked for his own private interests, that might establish being outside the scope. But I guess the problem is Thompson seems happy with Talonhead, right? What is the harm to Thompson from adopting Talonhead as opposed to Pride? Well, Thompson would— Even if Kublal got some private benefit by cozying up to Talonhead, if in fact it was still a legitimate business decision that served the interests of Thompson, wouldn't that still make it okay? Don't you have to show that there has to be a harm to the company? Well, Thompson Reuters decided to end its relationship with Pride as a result of Mr. Kublal's determination based upon inaccurate information. And so Thompson Reuters was the victim of the misinformation, of the lack of knowledge about Kublal's collaboration with Talonhead, of the misrepresentations about Pride's capabilities. Thompson Reuters had been very— In fact, others at Thompson Reuters when they learned about this were very upset and confused about why Mr. Kublal did this. And there are documents in the record suggesting that others, not just Pride, thought that he had a vested interest in Talonhead and he was doing this for personal gain, not for the benefit of Thompson Reuters. And so we believe that there are at least issues of fact which should have precluded summary judgment. Let a fact finder sort through this conflicting evidence. But is there some piece of evidence that shows that actually it wasn't in Thompson's interest to make that decision? Besides people being surprised by it. Like is there a—so if we're trying to establish whether he's acting in his own private interest to the detriment of the company, as opposed to his own private interest which is consistent with the interest of the company, what establishes that? What shows that? Well, his personal interest was to ensure that Talonhead got the job and that he punished Pride for refusing to be complicit with him. And the company suffered because they didn't have a payroll vendor who had the capabilities. I mean, we didn't have global capability. Talonhead was a startup. And they had to get Randstad, this other company, to finance the payrolling until Talonhead was built up. So he misled his employer as to the capabilities of Talonhead, which replaced Pride. I understand that. If I could just ask, you mentioned him being dismissed from Thompson. Do we have—does the record show that he was terminated in relation to this decision? No. It doesn't show that. But the record does show that shortly after he was terminated, Talonhead signed a contract with him and his company to continue sending him business. And to our knowledge, to this very day, he is collaborating and partnering with Talonhead. And we think he had that vested interest all along, which he did not disclose to his employer. Okay. Thank you, counsel. You've preserved a couple minutes for rebuttal. Thank you, Your Honor. Mr. Grossman. Good morning. Daniel Grossman of Harris, St. Lawrence & Wexler for Daniel Kublau. May it please the Court. Thompson's business decision severed any causal connection between Mr. Kublau's actions and the claimed interference. Nothing counsel has told you today and nothing in their papers creates a material fact issue as to the Thompson business decision. Thompson specifically investigated each and every one of the complaints that Pride makes today and against Mr. Kublau, including an alleged undisclosed financial interest in Talonhead, including misrepresentations made to the company, including that he had some ulterior motive in promoting Talonhead, all of which was investigated both by his direct managers, his current and former managers, others within the Thomson Reuters chain of command. Robert Goodall captured and reviewed all of Mr. Kublau's Thomson Reuters emails, interviewed Pride and others at Thomson Reuters, reached out to Pontoon, who did not participate, and Pride itself sabotaged the investigation by claiming to have a recording of Mr. Kublau to support its claims, which it refused to provide to Talonhead, did not produce in this litigation, and has admitted that it failed to preserve such a recording. The only inference to be drawn is that no alleged bribe occurred and that Pride never had those recordings and spoliated that evidence. Nothing in the record suggests that Mr. Kublau did anything but act within the scope of his authority as directed by Thomson Reuters senior management. The Thomson Reuters business decision to proceed with direct sourcing using the Talonhead solution was approved at the highest levels, both before and after Pride's complaints. What about his relationship with Talonhead? So he's going on a speaking tour that's sponsored by Talonhead, doesn't seem to be part of his job at Thomson Reuters. He's coming up with a model in which Pride gets business for Talonhead that's unrelated to his work for Thomson Reuters, right? I'm not sure I understand. Pride, you mentioned that Mr. Kublau would... I'll go back to your original question. I think the framing of your question is incorrect because it wasn't a speaking tour. It was part of Mr. Kublau's job to appear at direct sourcing or contingent labor conferences on behalf of Thomson Reuters to talk about the future of the industry. It was Mr. Kublau's job to transform Thomson Reuters contingent labor practices to reduce costs and reduce the number of vendors with whom Thomson Reuters worked. He succeeded in doing that through the Talonhead solution. I would also mention that Council's framing... So we have this claim that when he says that Pride is not a global company and is resistant to change, that those are misrepresentations. So in what way were they actually not a global company, resistant to change, and the Talonhead model was better? I think you're comparing two things that aren't comparable, right? So the framing of the Pride relationship with Thomson Reuters is misstated by Council. It was an indirect business relationship through this MSP, the managed service provider, Pontoon. When Pride says that its business relationship was terminated by Thomson, what really happened was that the Pontoon contract was allowed to expire. It was an at-will contract. And so what Pride is really saying here is that they had some sort of right to get a new indirect or direct contract relationship once Thomson Reuters' Pontoon contract ended, which is, I would say, a different theory than it is put before the court of tortious interference with business relations, but perhaps of prospective business relations, right? So I think the entire framing of Thomson Reuters ending its business relationship with Pride is incorrect. The model changed by replacing a managed service provider, Pontoon, with a different pairing of Ransett and Talonhead. And what Talonhead enabled Thomson Reuters to do was to bring in-house its contingent labor sourcing. And so instead of going to Pontoon and Pride to identify candidates for temporary workers at Thomson Reuters who would be payrolled by Pride, Talonhead enabled Thomson Reuters to build its own pool of temporary workers that it could hire directly. This was a tremendous success for Talonhead, as submitted in the Thomson Reuters declarations. It has saved the company millions of dollars. Eighty percent of its contingent labor workforce is now hired directly through its direct sourcing model. And the record reflects that- The tool enables Thomson Reuters to identify candidates from outside the company with whom they've previously worked on other temporary assignments so that they can- so they don't have to start from scratch each and every time they wish to fill temporary roles at the company. The record reflects- And so why is that a different- why is that incompatible with Pride doing the payroll work for those employees? Pride is saying that- Pride is alleging that it had some sort of right to be included in the new model, right? That just because it had- No, I understand. You're saying you don't have a right to do that. Right. But there's nothing incompatible about the new model with the services Pride was providing, which was payroll. Right. Payroll services were correct. There was- You couldn't have the direct sourcing model with payroll services provided by Pride. I think- are you asking- could Thomson Reuters have chosen to hire Pride to provide payroll services to its direct source candidates? Yeah. I suppose it could have, but it made a business decision not to. And Pride just seeks to second-guess the business decision made by Thomson Reuters. Well, I guess what I'm getting at is there's this claim that saying Pride is not a global company or is resistant to change were misrepresentations. Right. And so I'm trying to get at what- whether they are misrepresentations. Can I ask a question about terminology? When you're referring to global capacity, are we talking geographically or functionally? I think in this context, the term global was about scalability, right? So when the existing contingent labor practices began with many, many different vendors providing access to contingent workforce around the world, right? And so the idea was to bring in a company that could scale to provide those services both in the United States and Canada and everywhere that Thomson Reuters did business to reduce the number of vendors. Thomson Reuters determined that the TalentNet tool enabled that scalability and which has turned out to be true, right? As Wendy Stanger testified in her declaration, this program has been a success. I would add as for the supposed misrepresentations about what Pride could and could not do. The RFP process was reviewed in detail by Mr. Kublal's managers and by the very person that Pride claims was unhappy with the shift away from Pontoon, Lisa Moyer. Lisa Moyer and Nicholas Pasequin, who was Mr. Kublal's manager at the time, reviewed this RFP process in detail and found nothing wrong. So the idea that the speculative guess that Mr. Kublal somehow misrepresented something to his employer, which is not in the record, is undone by the subsequent investigation and determination that he had done no wrong. And that Thomson Reuters wished to proceed with the direct sourcing plan and directed Mr. Kublal to proceed. In fact, when the allegations were by Pride were made, Mr. Kublal wrote that he was suspending any decisions related to the program. That was overcome by his manager's specific direction to proceed. No, we are not suspending the implementation of this program. We are going to proceed Mr. Kublal. What about the allegation that he sought the job for $250,000? I guess you said a moment ago because the recording didn't materialize, you're saying that just never happened. You think that that was just a lie? There's no evidence of the bribe solicitation. It's immaterial because it's conduct not directed at Thomson Reuters, the party with whom Pride wishes to have a business relationship continue. But it might establish a motive for misrepresenting something to Thomson Reuters in order to punish Pride. It's also implausible, right? You asked about when Mr. Kublal, the circumstances with which Mr. Kublal left Thomson Reuters. He was let go as part of a reduction in force over a year after the events at issue. At the time, his salary was in the $240,000 range, just under the amount that Pride claims he sought in his employment with Pride. So it is implausible that he would devise a scheme to get himself— Well, if he thought he was going to be fired, it's not crazy for him to seek a job at the same salary. It's not as if—the motivation was not to get a bump up in salary. It was to get a job when he thought he was going to be terminated, right? That's the allegation. Well, I would disagree that there's anything to suggest that he thought his job was in jeopardy in the record, right? That's pure speculation. And instead, the Thomson Reuters declarations, the email record from before, during, and after the Pride allegations show legitimate, non-tortious reasons for Mr. Kublal's actions, all of which were within the scope of his employment, all of which were reviewed by Thomson Reuters and determined to be within the scope of his employment and in Thomson Reuters' best interest. And I guess the last thing we have not touched on today would be, I suppose, the sole motivation theory of Pride's case, which, of course, cannot stand because Pride has alleged mixed motives, right? And the Thomson declarations provide legitimate reasons for Mr. Kublal's actions. I see I'm out of time unless there are any further questions. Thank you, counsel. Thank you very much. Mr. Klausner, you have reserved three minutes. Thank you, Your Honor. I believe Appleby's argument highlights that there are factual disputes in this case. When counsel says there is nothing in the record to support that Mr. Kublal made this threat, there are affidavits from two of the Pride witnesses who were at the meeting when Mr. Kublal made the actual threat, and they lay out in detail what transpired there. When he says that there's nothing in the record regarding his misrepresentations about Pride not being a global company or embracing change, that's not true. JA191 is the email that Mr. Kublal writes to his supervisor in Europe where he says just that. Pride is not a global company, nor have they embraced the change. When he says that there is no evidence that Mr. Kublal was concerned about his job security, that's not true either. The CEO of Pride has testified that he told them he was. Can I ask you about causation again? Is there anything that you can point to that suggests that Pride would have retained this contract, if not for the alleged conduct by Kublal? Yes, because the evidence is Mr. Kublal made the decision to terminate Pride and that everyone at Thompson was very pleased with Pride's work for years until Mr. Kublal had this incident with Pride, who refused to be complicit in his scheme. But for Mr. Kublal running this, what we call a sham RFP, as a pretext so that he had the opportunity to get rid of Pride, Pride would not have lost its work with Thompson Reuters. This was all part of the scheme he devised in order to get rid of Pride and get work to TalentNet, with whom we believe he had a personal relationship. What about the mixed motive point? So if, in fact, he did have some kind of interest in TalentNet or wanted to work with them or maybe even was thinking about the future that he was going to work with them whenever he left Thompson Reuters, as long as that's consistent with Thompson Reuters' interest, if it's a mixed motive, then he's still acting within the scope of his employment, right? So it has to be that he has some kind of divergent, interest from the company, right? Right. Well, if his sole motive was to hurt Pride, that would be sufficient to prove the claim of tortious interference. If that was his motive in causing Thompson Reuters to end its relationship, if it was not his sole motive but he caused the – but in doing so, he also benefited Thompson, that wouldn't show that he had divergent interests, right? But – Maybe he was very excited that he had an opportunity to terminate Pride because he didn't like them, but it was a happy coincidence that also it served the interests of Thompson Reuters and he could do so. Right, that would still – that would not – you would not prevail if that were the case. You'd have to show that there's a divergence of interests. Well, but there are alternative elements that you can use to establish a tortious interference. One is that he was solely motivated to hurt Pride. Another is that he caused Thompson Reuters to make its decision based on misrepresentations about Pride or through his own deceptive conduct, whether that was hiding his relationship with TalentNet or creating this RFP as a pretext to convince Thompson Reuters to terminate that relationship. So the mixed motives might go to whether he was solely motivated to hurt Pride, but it does not excuse this alternative theory that if he was misrepresenting things to Thompson Reuters to facilitate his termination of Pride, that itself would stand alone as a tortious interference. So my final point, Your Honors, is just based on this record and even based on argument today, we do believe that there are a number of factual disputes that should let this case go forward so that a fact finder can assess credibility and conflicting evidence. Thank you, Your Honor. Thank you, Counsel. We'll take the case under advisory. The next argument on the calendar is No. 21-707, United States v. Ferber. Mr. Usen, whenever you're ready. Thank you, Judge. Good morning, Your Honors, and may it please the Court. My name is Joshua Bussen, and I represent the appellant in this case, Hawaja Muhammad Farooq. I did not represent Mr. Farooq in the district court. Your Honors, this court should vacate Mr. Farooq's conviction because the district court failed to ensure that Mr. Farooq knew about an essential element of the crime before he pleaded guilty to committing that crime. In United States v. Jackson, this court held that wrongfulness is an essential element of Section 875D. However, in the district court, Mr. Farooq was never informed of this essential element. Jackson also said that the threat's inherently wrongful when there's no claim of right to the thing that the individual's trying to get. And here, I thought, Farooq stipulated to that that he didn't have a claim of right to any relationship with Jane Doe. And as this court endorsed it in Jackson, reaches more than just entitlement. This court adopted the reading of extortion from Clemente, also from this court, which held that wrongfulness means using a wrongful method to achieve a wrongful objective. So all of those things would have to be proven to show that an act was wrongful. The district court asks a series of questions to make sure that Farooq understands the charges against him, right, what he's pleading guilty to, and she says, you threatened to expose these photos because you wanted to make her feel threatened, right? Like he agrees to that series of events. I mean, isn't that wrongful? So if, in fact, his later story that they were in cahoots and it was all voluntary or coordinated, shouldn't he not have agreed that his intent was to make her feel threatened? I think that starts to get into the difference between what is required under 11b1g and what's required under 11b3. The district court's questions were probing for a factual basis, but they did nothing to inform Mr. Farooq of what the government would have to prove at trial. Although Mr. Farooq answered the questions and believed under the reading of the law, as it was presented to him, that he was guilty, he had an incomplete understanding of the law. The indictment here did not include the element of wrongfulness, and that is the only instruction that the district court gave to him on the law. If you look at the back and forth that took place after that, and that comes in the appendix. But your position is that from his perspective, he did not understand it because he thought he was guilty, but if he had known about the wrongfulness element, he would not have pleaded guilty because what he was doing was pretending to extort her and to threaten her because they were acting in coordination, and she really wanted to marry him in the end result. Yes. He, after he entered into- And you're saying he reasonably believed that he was still guilty of extortion because the formal acts he was doing looked like extortion to an outside observer. I think- And he didn't appreciate that because, in fact, it was all consensual with respect to the victim, that it therefore wasn't illegal. I think as the law was explained to him, it was understandable for him to assume that having sent a message that on its face appears to be extortion, that he is guilty of the crime. That is the end of the story. The government, under his understanding, didn't have to prove that he had a wrongful intent to instill fear of harm to obtain a wrongful objective. But is it his story that he, in fact, did not intend to instill fear of harm? That's right. So wasn't it explained to him that he was supposed to- that he was pleading guilty to a crime in which he instilled fear of harm? No, I don't think so. The indictment simply recites the statutory elements of the crime, which say that he commuted a threat to reputation. I don't think that it goes far enough under what this court held in Jackson, which is requiring a showing of wrongful intent to instill fear of harm to achieve a wrongful objective. So you're saying that basically Mr. Fruk had a rightful intent to instill fear of harm. That's his argument. I think that he would have had the ability at trial- But he was not, in fact, instilling fear of harm, right? Because his argument is that she would not have feared harm from him. I think he would have been- Or was he going- or did she have a reason to fear harm, but that was also part of the plan? I think at trial he would have been able to argue that he both had a non-wrongful objective, which was that he was trying to help Jane Doe by getting her away from her brother-in-law, and also that he was working with her and that there was no attempt to instill fear of harm in her. And either of those would have negated the government's burden of proving wrongfulness. And because he never knew about any of this, he had no chance to raise it in front of the district court during the plea. But in his motions to withdraw his plea- Can I ask you this question? If, in fact, there was no element of wrongfulness, if we had never decided Jackson, could somebody be held guilty of extortion under the facts that he claims was the truth, that he was in cahoots with the victim and never actually intended to do the harm? Oh, I think so. I think without the wrongfulness element, there's all kinds of everyday extortion that could be technically swept up within the statute. In the United States v. Abeles case from this court, they used the example of a burglar alarm salesman who capitalizes on the fear of his customers to get their money to purchase his product. That is extortion, but it's not wrongful because you don't have a wrongful objective. And that example shows us why wrongfulness is important. It's important to separate innocent from criminal. But his version of events was that he actually was not capitalizing on her fear of anything because they were coordinating from the beginning, and so she had no reason to fear anything from him, right? That's correct. Isn't that his defense? So it's not even like the burglar alarm salesman. It is a slightly different factual pattern from the burglar alarm salesman, but it still shows why wrongful intent is a necessary element of the crime that the government would have had to prove at trial. He never got the opportunity to even learn that. I'm saying if in fact his version of events, the later version of events, that they're coordinating from the beginning is true, could you be convicted of extortion? Even putting aside the question of whether it's wrongful or not, it just would be the case that he was not extorting somebody, right? They were playacting in order to get the brother-in-law to release her. If a jury accepted that, then yes, he would not be guilty of extortion under either reading of the statute. But the problem here was exacerbated because he never learned of the wrongfulness element. Now, just briefly, I see I'm running close to out of time. I have a few extra minutes, but I was going to ask you to turn to the conditions of supervised release, in particular if you could start out by addressing what's not moot. I have had a chance in the last 24 hours to look into mootness issues again, and I'll note that yesterday in relation to the violation of supervised release, the district court revoked Mr. Farooq's prior supervision, sentenced him to time serve, and imposed a new supervised release term that will expire in February 2023. One condition that we challenged was reimposed, another was not. And our position is that both arguments are still justiciable. They are not moot under the doctrine of capable of repetition but evading review, and also for the attendant harm. Because they could be reimposed. Well, let's start with the retraction requirement. How is that not moot? The district court could still reimpose that on his supervised release if he violated again. So it is capable. There's a possibility that the district court did that. You could appeal that decision, right? You could appeal that decision, but his supervised release is up in February, so it is highly unlikely that he would be able to get through a briefing at this court and be able to get a decision before that. So it is escaping review. I think for both of the conditions, one is currently imposed, and the other could be imposed if he violated. So they both are capable of a repetition and evading review. Can I ask you, so I know you have an argument that his appellate waiver was not knowing and voluntary, but if we were to say that it was, does the appellate waiver cover challenges to the conditions of supervised release? No. The conditions of supervised release are not specifically mentioned, I believe, in the flee waiver. I believe it only discusses the sentence itself, and this court, as we cited in our brief, has not enforced plea waivers as to special conditions of supervised release when they're not specifically named in the plea agreement. And he had no notice that these specific conditions were going to be imposed, which in general lowers the burden even further for him to show that there was a plain error or that there was an abuse of discretion. Here I think as to both conditions, they're extremely overbroad in what would be permissible as a supervised condition, a condition of supervised release. They sweep up speech that is in no way unlawful or threatening. Both on their face are subject-based restraints, and I think under the First Amendment, neither of those can survive review by this court. But if somebody is harassing another person, oftentimes that's accomplished through speech about that person, right? So you're going to have subject-matter-based restraints, are you not? I think if you had a subject-matter-based restraint that focused on unprotected speech, then you probably could impose- You can't direct fighting words at the target of your harassment, but that's already- I think it would have to come closer to fighting words or threatening speech at the very least. But saying that Mr. Farooq cannot- Extortion is not protected, and it seems like the district court's finding here was that the publications about Jane Doe were sort of related to the extortion in that they were designed to instill fear or to sort of remind Jane Doe of the potential for the publication of the nude photos. I believe that the record reflects that they were related to conduct with John Doe, not Jane Doe, and so it takes it even a further step away from the conduct that he pleaded guilty to. But additionally, for example, the order saying that he- about her to John Doe and others in such a way that would ruin her life. I understand that that was the district court's concern and what it was trying to get to, but the condition that it issued says that he may not disseminate any information in any medium. So under that reading, he can't talk to his lawyer or his therapist without calling the district court for permission first. That sweeps up too much protection. I mean, dissemination is public dissemination, doesn't it? Dissemination, I think, could be read as speaking. Okay, so if we were to say that we understand dissemination to be public dissemination, would that resolve the problem? I still don't think so. I still think it sweeps up too much protected speech. There are too many ways that he could write articles or publicly disseminate things. There was this colloquy with the district court when she imposed the condition in which Farouk's attorney said there's a first amendment problem. What if he wants to write a book or something? And she said, well, if he wants to write a book, he can come get permission. But he's been directing too much speech at John Doe and Jane Doe and using that as a threat to extort them that I think the condition is necessary. So why doesn't the district court's expressed intent that if it really is something that's a matter of public concern, it would be allowed? Why doesn't that resolve the concern? I think giving editorial control to the Eastern District of New York over publication of protected speech goes too far. I think that under this court's approach, which is in line with the Supreme Court's, that you can't sweep up protected speech or unprotected speech. I was right. Protected speech just to get at unprotected speech. Well, you can't do that as a general matter. But certainly as a condition of supervised release, you have less liberty than the general public, right? That's correct. So in fact, hurling insults at a person and even providing personal information about the person in a public venue would be protected speech. There's no reason why the First Amendment doesn't protect that. But for somebody who is a harasser, it seems like you could restrict that, right? So there are going to be restrictions on protected speech. So your argument is not that there's protected speech that's restricted. Your argument is that it is far too broad and sweeps too much protected speech. So I guess my question is this. What is the speech in which he would want to engage that is unrelated to his harassment of the victim that he's now not allowed to do because of the condition? He could write a book, an article, or a Facebook post saying, I feel like I was treated unfairly in this case. I don't think that would be harassing or threatening to the— But if that doesn't communicate information about John Doe or Jane Doe, wouldn't that be allowed? I think it depends on how you slice about Jane Doe or John Doe. This case is about them, and it gets very close in talking about his case to talk about them as well. I think if we broadened it to say if he wanted to write an article saying, I believe I was wrongly accused by Jane Doe in this case, that he should be able to do that because the First Amendment protects his right to do so. Can I ask just before you sit down about the withdrawal of the guilty plea? Sure. So the district court seems to think that his story about being—about coordinating with Jane Doe is—she says a lie. It just doesn't think it's true. Is that not a legitimate basis for declining to allow him to withdraw his guilty plea? I think that unsubstantiated claims that a defendant is legally not guilty have been rejected in the past and upheld by this court. But where the defendant puts forward something more, this court has instructed the court should look into that. Here, Mr. Fruk said he had recordings that would show that he was legally innocent. The district court didn't appear to have listened to those or considered them in ruling on his motion to withdraw. And just one side note on that, although what the district court found as the honesty or truthfulness of his story does play into the motion to withdraw the plea, for the purposes of Rule 11, this court has found before that a defendant was likely guilty of the crime. In Irizarry, the court said the defendant was likely guilty. He probably knew that he was guilty, and it found that there was a factual basis for the plea, but it still said that the errors in the plea proceeding, failing to ensure that the defendant understood the crime, was an error that warranted vacating the conviction. And I think that the court should do the same here. Thank you, counsel. Thank you, Judge. We'll hear from the government. May it please the court. Assistant United States Attorney Kayla Bensing for the government. I want to address each of counsel's arguments today, but I want to start by grounding them in the factual record in this case. The defendant for months threatened a young woman residing in Pakistan to disseminate nude photographs of her to other men, including her work colleagues, if she wouldn't return to a sexual relationship with him. The defendant admitted to this conduct at his guilty plea, and that grounded the district court's colloquy and subsequent denial of his motion to withdraw his guilty plea. And that conduct also advised the court at sentencing in imposing tailored supervised release conditions that were reasonably related to the crimes in this case and the lengthy record of the defendant's violation of court orders. There was no plain error, and the district court did not abuse its discretion. So I'll just start with the Rule 11 errors, Your Honor. And I want to first turn to the argument about wrongfulness and the recitation of the law in Jackson and some of the other cases that the defendant cites, too. And I want to be very clear that Jackson defined wrongfulness. Jackson, of course, required wrongfulness, but it defined wrongfulness as when a threat is used to obtain property to which the threatener is not entitled. That was part of the allocution in this case. The district court asked the defendant questions about this. The defendant, through his counsel, stipulated to this, and his counsel said, I spoke to my client about this prior to making that stipulation. So here I think all of the elements that were actually described and defined in Jackson were part of the plea allocution in this case. So there have been some- So the acknowledgment that he did not have an entitlement to a relationship with Jane Doe sufficiently satisfies wrongfulness in your mind? Yes, and just because it really tracks the language that this court used in Jackson, where it said wrongful is when a threat is used to obtain property to which the threatener is not entitled. And here they stipulated that the property was the relationship with Jane Doe, and the defendant stipulated that he was not entitled to that. It very clearly tracks Jackson. That was both the government and defense counsel's intention, and I think it does track Jackson. His argument now is that he is entitled to it, right, because they were coordinating all along, and so she wants to be with him, in which case it's- I mean, I guess he's not entitled to it, but he knows that she wants to give it, and so therefore, I guess my question is this. I mean, given his new version of the facts, could he have pleaded guilty even based on the district court's instruction at the time of the plea agreement? Well, I guess what I'll say is he made those claims months and months and months after the guilty plea in this case. In fact, he made a motion to withdraw a guilty plea without making those claims, and then even months after that, he finally came up- or he finally made these claims about being in cahoots with Jane Doe, but I think the court referenced this in some of its questioning to my colleague, where he said that it was his intention that she feel that if she did not come back to him, he would send the pictures to other men, and that when he sent the transmissions, his goal was to get her to come back to him or agree to marry him. And so that is just contradictory to what he said later on in his second or third motion to withdraw his guilty plea. So he allocated to this. This court has held time and time again that a defendant's statements under oath should be credited unless seriously undermined by something down the line, and that wasn't the case. Just to get into the motion to withdraw the guilty plea for a minute, my colleague stood up here and said that, well, it has to be supported by some sort of evidence, and here it was supported by these recordings, but that's not the case. The recordings were presented to the district court at sentencing. In fact, the sentencing was adjourned month after month so that the defendant could get these recordings translated. The district court was very, very clear during the sentencing proceeding that she had reviewed all of the transcripts, and if you look at the transcripts themselves, which are part of the confidential appendix, you'll see that none of them support the claim that the defendant is now making. So there really is nothing underpinning this. The transcripts of these recordings are undated, so I think that they're entitled to very little weight, but all they do is indicate that at some point the defendant had a romantic relationship with Jane Doe, which everybody agrees on, and that the defendant and John Doe had disagreements about the nature of that relationship. So they don't actually underpin what the defendant pled guilty to and what he allocated to. They don't show that they were in coordination at the time he was extorting, but they do show that there was a consensual relationship at some time. Right, which was the whole theory of the case, that there was a consensual relationship at some point. She cut that off, and the defendant never accepted it and didn't just not accept it, but threatened her in email after email, communication after communication for months, Your Honor, which is all set forth in the PSR in this case. I want to just briefly turn back to Jackson and address some of the arguments. So you're saying that in terms of the withdrawal of the guilty plea, that actually this is just like other cases with an unfounded claim of innocence? Well, and the court made a factual determination here that the defendant was lying. The record is replete with the defendant lying, and I think the standard there is clearly erroneous, and I don't think that that can be even close to being met under the factual record that the court has before it. I want to just briefly address this argument from Jackson that there must also have been an intent to instill fear of harm. So, again, Jackson was very, very clear about the requirement of wrongfulness and what that has to entail, and I think Jackson, too, when it went back to the Second Circuit, was even clearer. The court held that the court should have informed the jury of the wrongfulness element by instructing that 875D prohibits obtaining money or a thing of value from another by use of threats to reputation only if the defendant has no plausible claim of right to the money demanded or if there is no nexus between the threat and the defendant's claim. There's nothing in there about having to specifically prove fear, and I would note that some of the cases that are cited by the defendant, for example, I think a Fourth Circuit case, United States v. White, really come to the conclusion that once you've met that wrongfulness standard, it's implied that the threat is by fear or by force in the Hobbs Act, for example. Is that necessarily? I mean, there's two parts to it, right? There's the entitlement to the thing that you're trying to get, and then there's the means that you use to do that, and the focus, I think, here is that the wrongfulness from Jackson addresses the former but not the latter, and it's, I guess, theoretically possible that the latter could be completely kosher without, and then the wrongfulness requirement would be necessary to get to the mental state there. Right. I think either way you're getting to the wrongfulness intent that Jackson requires, and so I don't think that this additional requirement of specifically stating some sort of fear makes sense given the language of Jackson and what this court requires, and it certainly wouldn't be plain error. In any event. So I can now just briefly address the supervised release conditions in this case. I do think that the second condition as to the redactions or the retractions of the prior articles is absolutely moot. This court held in Browder a recent summary order, 807 Federal Appendix 44, that where a condition of supervised release is modified or the term expires, challenges to such conditions are rendered moot. What about the other conditions? So can he comment on his case? Can he say, I think I got a raw deal from the district court and not run afoul of that condition? Absolutely, and, in fact, there were multiple articles that the defendant wrote during the pendency of this case, and some of them called the prosecution the mafia and made allegations against the district court judge. So what can't he say? Can he say, I think Jane Doe improperly accused me or wrongly accused me? I don't think he can disseminate information about Jane Doe. If he has an opinion about her conduct in the case, he can't express that without the district court's approval. I think that's right. For the period of supervised release, which was obviously a short period in this case, it's only- Isn't that overbroad? I mean, that's not harassment. That's about what happened to him in this trial. That's not about some accusation that he's going to disseminate nude pictures of her. Well, I think in that case, that would be the kind of thing that the district court would say, you're entitled to do this. This doesn't cross the line into being threatening. And that was the whole back and forth at the sentencing proceeding in this case where the district court said- Well, no, because I don't think that's quite- I think the district court was wanting to be in a position where he could not disseminate information about Jane Doe or John Doe. So whether or not that would even qualify as information, I think, is a question. I'm not sure that it does qualify as disseminating information. It's his opinion. And so I think- Well, the idea that she's being kidnapped and all of that is also, I guess, people would say it's his opinion because a lot of people don't believe it. Right, but I think that falls squarely within what the district court was trying to prohibit. And so I think if he wanted to say that she was being kidnapped by John Doe and all of the rest, I think that would fall within the same harassing conduct that underpinned the factual conduct of the case originally. And so I think that would be prohibited by- To disseminate that, Your Honor. First of all, disseminate, I guess, just to clarify this, your view of that is it's public dissemination. It's not any statement that he makes to anybody. Yes, exactly, Your Honor. Okay, so he can't publicly disseminate that. He can't say that to the public unless he gets the district court's permission. Yes, Your Honor, exactly. So that means he can't even repeat the defense he made in the trial proceedings to the public without getting the district court's permission? Right, for just a limited period of supervised release and he has to get approval by the district court. I think that that is not overly broad in a case like this where the defendant repeatedly violated court orders and repeatedly- Well, I think you were saying it is overly broad because you're saying that that's a case where the district court should let him do it. That the overbreath is a tool to make sure he doesn't end up disseminating harmful information. Well, I think the claim that he had gotten into a marriage with Jane Doe and that she had been kidnapped, that is harmful information. That is some of the factual conduct that underpinned this case, the Fretz case, Your Honor. I think as to him just saying I was wrongfully convicted, I'm not sure that that counts as dissemination of information. If I were his attorney, I would probably advise him to write to the court in any event, but I'm not sure that that qualifies as an actual dissemination of information. And so I do think that it is narrowly tailored and reasonably related to the conduct in this case. Well, so now it expires in February, but before this morning's modification or whatever it was that it happened, it was indefinite, right? So what accounts for the change? Weren't the conditions indefinite? No, I think that was just a misunderstanding from the defendant's brief. Oh, okay. So what was- This condition just lasts for the period of supervised release, which is one year. That should have expired in the spring. It got extended because the defendant violated one of the other conditions of supervised release. So now it is extended until February? Until February of next year. Only a few more months, Your Honor. Can I ask, what are we talking about in terms of dissemination of public information? I thought there was something about the defendant being a journalist or having credentials that made this particularly relevant as opposed to just like a social media post or something. Right. That's exactly right. So as the court alludes to, the district court even applied, I think, a sort of unusual chapter three of the sentencing guidelines enhancement in this case based on the defendant's use of a special skill, which is his repeated use throughout the pendency of the conduct in this case where he would say things like,